DAVE BARRY v. THE STATE.

*No. 1167.   Decided March 17th, 1897.*

**1.  Witness—Cross-examination as to His Whereabouts.**

A witness for defendant may, on his cross-examination, be asked as to his whereabouts at the time of the transaction, although not questioned concerning it on his examination in chief.

**2.  Same—Murder—Statement by Prosecuting Attorney.**

On a trial for murder, the County Attorney, on cross-examination of a witness for defendant, asked him, "Is it not a fact that you stated to Mrs. H., while the shooting was going on, that it was defendant killing the deceased, H.; that you knew it was going to come off; that your mother sent you and your brother, T., away from home, so that you would not be there when it happened?"  To which defendant objected because irrelevant and immaterial, whereupon the County Attorney stated, in the presence and hearing of the jury, that his purpose was to lay a predicate to impeach the witness and show a conspiracy to kill the deceased.  And the witness, before the court could rule upon the point, answered the question in the negative; but defendant insisted that the statement made by the County Attorney was improper and calculated to prejudice defendant.  Held:  That while the question asked was not a proper one, no prejudice calculated to injure defendant is apparent from the statement made by the County Attorney.

**3.  Bill of Exceptions to the Admission of Testimony**

A bill of exceptions reserved to the admission of testimony, to be sufficient, must show what the testimony was.

**4.  Murder—Evidence—Acts and Conduct of Third Parties.**

On a trial for murder, it is not competent for the State to prove, that, on the morning after the killing, the mother-in-law, sister-in-law and wife of the deceased were together laughing and talking, apparently as if nothing had happened, there being no proof of a conspiracy between these witnesses and defendant to kill deceased; and, if there had been such conspiracy, it was at an end.

**5.  Same.**

Nor was it competent for the State, for the purpose of showing that Mrs. F., the mother-in-law of both defendant and deceased, was interested in procuring testimony for defendant or fabricating the same, to elicit from a witness the fact, that, on the morning after the killing, Mrs. F. endeavored to make her remember the language, acts and conduct of deceased on a certain occasion towards the wife of defendant, and on the witness replying, that she did not hear deceased use the language; defendant's wife said, "You will have to remember it," or "You must re member it."  Nor was it competent to prove, by this same witness, that, during the trial then going on, she had seen defendant's witnesses frequently talking together in private, in a low tone of voice.

6. **Same—Testimony of Wife of Deceased—Deceased's Insurance Policy.**

On a trial for murder, where the wife of deceased was a witness for defendant, the State was permitted, over defendant's objection, to prove by her on cross-examination, that her husband, the deceased, had a policy of insurance for her benefit on his life; and the State was also allowed, over defendant's objections, to introduce said insurance policy in evidence. Held: There being no evidence of a conspiracy upon the part of the wife and the defendant to take the life of deceased, and no evidence tending to show that the wife was instrumental in instigating, promoting or causing the killing of her husband, the evidence was inadmissible and prejudicial to defendant's rights. It was not legitimate evidence for the purpose of discrediting the wife as a witness.

APPEAL from the District Court of Tarrant. Tried below before Hon. S. P. GREENE.

Appeal from a conviction for murder in the first degree; penalty, imprisonment for life in the penitentiary.

The indictment charged appellant with the murder of one Tim Healey, in Tarrant County, on the 16th day of September, 1895, by shooting him with a gun and pistol.

Appellant and deceased were brothers-in-law, having married sisters. They lived in adjoining houses, and on the same lot with Mrs. Ford, their mother-in-law. There were no fences dividing their premises. The testimony, as to the origin of the difficulty, presents two theories, i. e.: that defendant owed deceased a board bill and deceased had threatened he would kill him if he did not pay it; and defendant killed him on account of the threats; also, that deceased had his life insured for $1500, for the benefit of his wife, and that his wife, the defendant and Mrs. Ford, the mother-in-law, had entered into a conspiracy to have him killed by defendant in order to get the money. The theory of the defense was, that deceased, on three several occasions, had been guilty of grossly insulting conduct towards the wife of defendant, and that defendant's wife had told him of this conduct, about 30 or 40 minutes before the killing. Defendant had rented a double-barrel shotgun that morning. After his wife had told him of the insults of deceased, she went to her mother's house. Her mother and her sister, Emma Ford, had gone to a neighbor's, a Mrs. Trantham, who was sick, and Mrs. Barry went over there. Deceased was sitting in his house, reading. Defendant, in his own behalf, testified, that, after his wife had gone over to Mrs. Trantham's, he got to thinking over what she had told him, and the more he thought about it, the madder he got. He says: "The shotgun was sitting there in the corner of the room, and I just picked it up and thought I would go over to deceased's house and ask him what he meant. I picked up the gun, stepped out of my front door, and as I started to deceased's house, I saw him, through the window, sitting in a chair by the window, being only a few feet away. I just stepped to the window and asked him what he meant by insulting my wife that way and threatening to take my life for? He made some motion down by his side with his hand, after I made the remark to him that I have just stated, he just looked around to me and said, 'I will kill you.' As he said this, he made the movement I have just

described. When he did this I fired. I ran around to the front door, and after I got around to the front door, I waited a little while and he didn't appear. I then ran into the house and saw him running through the middle room into the kitchen, and I shot at him again. I fired two shots through the window. After firing the two shots I reloaded the gun and waited a little bit, but as he didn't come out I went into the house. I shot at him as he was going into the kitchen. I ran in there and saw him running across towards Mrs. Trantham's, and I took after him; and then I don't know what happened. I guess I tried to strike him, tried to kill him. I was so mad I was like a crazy man, and I don't know what I did. I guess I stamped him in the face as the witnesses say I did, and shot him in the face and struck at him with the gun. When Johnny Trantham pulled me away from the deceased on Mrs. Trantham's porch and carried me out into the street, I thought I was going home, but as I would go along the more I would think about him and what he had done to my wife, the madder I would get; and I just grabbed a pistol over there and went back and shot him again. The first time after I saw deceased after we parted at the gate early that morning after he had made the threat I have testified about, and after my wife told me about his conduct towards her and her sister Emma, and my wife had stepped over to Mrs. Trantham's, and I started out of my house with my gun with the intention of going after the deceased, was when I then saw him sitting at the window. I had never had any trouble with the deceased nor had any ill feeling towards him, and didn't know he had anything against me until the threat he made that morning at the gate."

The facts attendant upon the killing were testified to by J. L. Trantham, he says: "I live on Wynn street, in the city of Fort Worth, Tarrant County, Texas. I know the defendant. I knew Tim Healey during his life time—he is dead. He died in Tarrant County, Texas, on the 16th day of September, 1895. The defendant and deceased lived on the west side of Wynn street. The defendant lived about 60 or 70 feet from where I lived. The deceased, Tim Healey, lived in a small house just south of the defendant and about 80 feet from where I lived. The defendant and deceased lived in the same yard; there was no fence between their houses. On the evening of September 16th, 1895, I was at my house on Wynn streeet; about dark on said evening I heard the report of a shotgun in the direction of the house in which the deceased, Tim Healey, was living. I looked out of my window in that direction and heard and saw the flash of another shot. The party that was doing the shooting was at or near the north window of the front room of Healey's house. I heard three or four gun shots over at this place. Immediately after the shooting I saw Tim Healey running in the direction of my mother's house. The defendant was running after and close behind him; defendant seemed to have hold of deceased with his left hand and was striking him with the shotgun in his right hand. As they got to my mother's front porch, the defendant, striking at the deceased,

struck the top of the porch and broke the gun. Healey fell on the front gallery of my mother's house. Healey did not have any kind of a weapon; he was in his sock feet, bare headed and had no shirt on; he only had on an undershirt and a pair of overalls, socks. When deceased fell on the gallery, defendant stamped and kicked the deceased in the face and on the head. I pulled the defendant away from where the deceased was lying, and said to him: don't do that; and he said: 'I have killed the damn son-of-a-bitch in self defense.' The defendant appeared perfectly cool though he appeared to be mad. I pulled the defendant out of the gate and went about half way from where Healey's body was lying and the defendant's house with the defendant; he went on in the direction of his house and I started after an officer and a doctor. I had gone two blocks when I heard three or four reports of pistol shots in the direction of where I had left Healey's body lying. I went back to where Healey was lying and found him lying in the same position that I had left him a few minutes before. He was lying on his back with one arm and hand across his body and the other lying out to one side. He had several pistol shot wounds in his face and head. His face was very badly powder burned. His cheek was stamped in and the bone broken; his nose was also broken; his left arm was shot nearly off. This wound was from a gun shot. The lower portion of his left hand was torn off from a load of shot. Tim Healey was killed on the 16th day of September, 1895, in Tarrant County, Texas."

It is unnecessary to give any of the testimony of the other witnesses.

Defendant reserved twenty-two bills of exception to rulings of the court in the conduct of the trial. The opinion states all the facts necessary to an understanding of such of these exceptions as are discussed, and no further statement is called for.

*Parks & Carden,* for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for the term of his natural life; hence this appeal. With regard to appellant's first bill of exceptions, we do not believe that it is well taken. The witness, Dennis Ford, was placed on the stand by the defendant, and, although defendant may not have asked him anything about where he was at the time of the difficulty, yet on cross-examination we believe it was competent for the State to show by him where he was at the time the shooting occurred. There is nothing in appellant's second bill of exceptions. The witness, Dennis Ford, on cross-examination, was asked the following question: "Is it not a fact that you stated to Mrs. Haddix, while the shooting was going on, that it was defendant killing the deceased, Healey; that you all knew it was going to come off; that your mother sent you and your brother, Tim Ford, away

from home, so that you would not be there when it happened?"—"to which question the defendant then and there objected, on the ground that it was not a material inquiry in the case, was irrelevant," etc. The County Attorney stated, in the presence and hearing of the jury, that his purpose was to lay a predicate to impeach the witness, and to show a conspiracy to kill the deceased. The witness answered this question in the negative; but appellant insists that the question was illegal, and the statement of the County Attorney as to his purpose in eliciting the proof was improper, and calculated to prejudice appellant. It seems that the witness answered the question before the court had ruled on it, and the point of appellant's contention is, as above stated, that the question was illegal, and the remarks in connection therewith were improper. Strictly speaking, the question was not a proper one, for, shaped as it was, it did not propose to elicit any fact and would not have afforded a ground for impeachment; but we fail to see any such prejudice ensuing as was calculated to injure appellant. The bill of exceptions reserved as to the testimony of Mrs. Haddix does not show what her testimony was, and we therefore cannot tell what she testified to. The court withdrew it from the jury, but its nature is not stated, so it does not appear that the action of the court in regard thereto constitutes error. We do not believe it was competent for the State to prove by the witness, Mrs. Jackson, the conduct of the witnesses, Mrs. Ford, Mrs. Healey and Mrs. Barry on the morning after the homicide. She was permitted to state that she went to the house of Mrs. Ford, and saw said parties there. They were at the table laughing and talking, apparently as if nothing had happened. There was no proof of a conspiracy on the part of these witnesses with the defendant to take the life of the deceased, and, if there had been such a conspiracy, this circumstance happened after the commission of the homicide, and would not have been admissible, being a subsequent act, even though they had been co-conspirators with the appellant. Mrs. Ford was the mother-in-law and Mrs. Barry the sister-in-law of the appellant, and were also the mother-in-law and sister-in-law of the deceased, and Mrs. Healey was the wife of the deceased. Now, the fact that they were guilty of heartless conduct following immediately after the homicide, or that the witness should have been permitted to draw such a conclusion, and to state that impression to the jury, could serve no legitimate purpose in the case, and its only influence would be to the prejudice of the appellant. Nor do we believe it was proper for the State to elicit from Mrs. Jackson testimony to the effect that, on the morning after the homicide, she was at Mrs. Ford's, and that Mrs. Ford endeavored to make her remember that on a certain occasion the deceased, Healey, rubbed his hand on the stomach of Mrs. Barry, the wife of defendant, and asked her (Mrs. Barry) when the "damned little bastard was going to be borned;" and, on the witness replying that she "did not hear deceased use that language," that then Mrs. Barry said to her, "You will have to remember it," or, "You must remember it." Now, if Mrs. Ford had been placed

on the stand, and she had been examined as to this matter, for the purpose of showing that she was interested in procuring testimony for defendant, or fabricating the same, and she had denied making this suggestion to Mrs. Jackson, then Mrs. Jackson might have been examined upon this point solely for the purpose of impeachment; but such does not appear to have been the case. Nor do we believe it was competent for the State to show by the witness, Mrs. Jackson, that during the trial which was then going on she had seen defendant's witnesses talking together frequently, in private, in a low tone of voice. We do not believe the court's explanation authorized this testimony, and its only effect was to suggest something undue or improper on the part of these witnesses with regard to their testimony, and so was calculated to be hurtful to the defendant. Appellant's sixth bill of exceptions is as to the action of the court in allowing the State to prove on the cross-examination of Mrs. Tim Healey (wife of the deceased) that deceased had an insurance policy for $1500 on his life for her benefit, which was objected to on the part of appellant, on the ground that no predicate had been laid for the introduction of the same, and that testimony in regard to said policy was immaterial, irrelevant, and incompetent; also by appellant's twenty-second bill of exceptions he raised the same objections to the introduction by the State of the life insurance policy itself, which was introduced in evidence over his objection. The court in the charge to the jury limited the purpose of this testimony as going to the credit of the defendant's witness, Mrs. Tim Healey. The language of the court in this respect is as follows: "You are further instructed that the testimony, oral and documentary, of the existence of a policy of life insurance on the life of Tim Healey, and the other testimony in relation thereto, was admitted in evidence for the sole purpose of showing the interest on the part of Mrs. Healey (if, in your opinion, such testimony does show, or tends to show, any interest on her part) in the death of said Tim Healey, thereby explaining (if, in your opinion, it explains or tends to explain) her evidence given in this case; and you will consider said testimony for such purpose only, and no other." The question presented is, was the testimony, the admission of which is complained of by appellant, admissible for any purpose? If there was testimony showing, or even tending to show, a conspiracy on the part of Mrs. Healey (wife of the deceased), in connection with defendant, to take the life of deceased, the evidence of the existence of a life insurance policy in favor of Mrs. Healey would be material, not only as bearing upon her testimony, but as furnishing a motive on the part of defendant for the perpetration of the homicide. Possibly, if there was testimony in the record tending to show that Mrs. Healey instigated the killing, though appellant himself was innocent of any guilty connection in conspiring with her to perpetrate the homicide, under the circumstances the policy of insurance might have been admissible for the purpose of discrediting her. We have carefully examined the record, and there is no testimony on the part of the State which, in our opinion, tends to show a conspir-

acy on the part of the defendant with Mrs. Healey, or with others, to·
commit the homicide; nor is there any evidence which tends to show
that Mrs. Healey was instrumental in instigating or causing the homi-
cide.    As to the life insurance policy itself, the State introduced no evi-
dence showing that defendant had any knowledge of its existence, ante-
rior to the homicide, and the defendant testified that he had no such
knowledge.    Now, in the absence of any proof tending to show a conspir-
acy between defendant and Mrs. Healey (wife of deceased), or any fact
which tends to show that she suggested, instigated, or promoted the
killing, we are aware of no legal principle upon which said testimony
regarding the insurance policy on the life of the husband of Mrs.
Healey was admissible in evidence.    The court limited the purpose of
this testimony to the impeachment of Mrs. Healey.    Without some
guilty connection on her part in causing the murder, Mrs. Healey would
be entitled to receive payment of said policy, whether the defendant in
killing the deceased committed cold-blooded murder upon express
malice, or whether he slew him in self-defense; so, in either event, the·
fact that she had an insurance policy on the life of her husband would
be absolutely immaterial—her interest would be the same either way.
Said policy could only go to her credit in the contingency above stated,
that she had conspired with the defendant to kill deceased, or in some·
manner had instigated or was instrumental in causing the death of de-
ceased.    So that the real effect of the limitation by the court in its
charge as. aforesaid was to instruct the jury that, if they believed she
had any guilty connection with the homicide said policy could be used
by the jury for the purpose of discrediting her, at least, the charge is
pregnant with this suggestion; and the evidence, which was improperly
admitted, was calculated to. suggest to the jury a guilty connection
with the homicide on the part of the witness, and to unquestionably
prejudice the defendant's rights.    Said insurance policy under the cir-
cumstances of this case, was not legitimate evidence for the purpose of
discrediting the witness, Mrs. Healey.    The circumstances of this case,
as insisted upon by the State, show a most atrocious murder.    The de-
fendant himself, of all his witnesses, makes some suggestions in his
evidence tending to show self-defense.    The testimony of his witnesses
does not attempt to gainsay a brutal killing, but the effect of their tes-
timony is to show adequate cause to reduce such killing, which would
otherwise be murder, to a case of manslaughter, predicated on insults
to the wife and sister-in-law of appellant, and which had been com-
municated to him on the evening of the homicide, and but a short time
prior thereto.    We take it, that his real defense was manslaughter upon
adequate cause.    This adequate cause was presented in the testimony
of Mrs. Ford, Mrs. Barry (wife of defendant), Emma Ford, and Mrs.
Healey (his sister-in-law).    The testimony of all these witnesses was
material in establishing appellant's defense, and the effect of the illegal
testimony was to suggest to the jury, and may have been used for that
purpose, as furnishing a. reason on the part of all of said witnesses to

get rid of the deceased, and to suggest to the jury that the insults to the female relatives of the appellant was but a pretext, and that the real purpose of the homicide was to dispose of the deceased, so that they might enjoy the fruits of the policy; and the illegal testimony was calculated to, and no doubt did, in that way, affect all of the defendant's witnesses, and so strike at his main defense. As was said in Brittain v. State, 36 Tex. Crim. Rep., 406: "If the testimony did not tend to impeach or have that effect, it was before the jury, and notwithstanding the limitation, its effect was calculated to prejudice the defendant before the jury, and, as they might fail to see how such testimony might impair the truthfulness of the defendant as a witness, they might feel constrained to use it in some other way against him." The judgment is reversed, and the cause remanded.

*Reversed and Remanded.*