## JEROME DAY v. THE STATE.

### No. 1294.  Decided May 24, 1911.

**1.—Assault to Murder—Declarations between Third Parties.**

Upon trial of assault to murder the court erred in admitting testimony that, after the shooting, the State's witness had a conversation with the co-defendant of defendant in which said codefendant cursed the witness and tried to intimidate him into swearing in favor of codefendant.

**2.—Same—Charge of Court—Conspiracy.**

Where, upon trial of an assault with intent to murder, against defendant and others, there was no evidence of an agreement between defendant and his codefendant to make an unlawful attack on the party injured, it was reversible error to submit a charge that such an agreement was entered into.

Appeal from the District Court of Denton.  Tried below before the Hon. Clem. B. Potter.

Appeal from an aggravated assault; penalty, a fine of $1000 and one hundred and fifty days' confinement in the county jail.

The opinion states the case.

*Owsley & Sullivan* and *Emory C. Smith,* for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Under an indictment charging assault to murder, appellant was convicted of aggravated assault, his punishment being assessed at a fine of $1000 and 150 days imprisonment in the county jail.

1. The court permitted the State's witness, Finlayson, to testify that after the shooting of Harry Hightower, the alleged assaulted party, that he had a conversation with his uncle, John Day, in regard to his, witness', evidence in this cause, in which his uncle cursed him, and asked him if he had not heard Hightower threaten his, John Day's, life.  The witness stated that he had not, whereupon John Day jerked out his knife, cursed the witness, and said to him, in substance, that he, witness, knew such threats had been made, and that he would have to go to Denton and make a sworn statement before his lawyers; and also permitted said witness to testify that he had had a difficulty with said John Day in Mrs. Lowe's pasture after said Hightower was shot, and that he had promised John Day at the point of a knife that he would come to Denton and make a statement to his, Day's, lawyer, and also permitted the witness to give particulars of this difficulty for which said witness had filed a complaint against John Day.  Many objections were urged to this testimony by appellant, which are set out in the bill of exceptions.  The bill also shows that appellant was not present, and the record fails in any way to connect appellant with the transaction between John Day and the

witness Finlayson. This testimony was inadmissible. In view of the numerous authorities holding this character of testimony inadmissible, we deem it unnecessary to discuss at any length the question. For some of the authorities see White's Annotated Code of Criminal Procedure, sec. 1097. This testimony was introduced for the purpose of showing that John W. Day was seeking to induce the witness Finlayson to testify to facts that Finlayson said were not true, and which would have been of benefit to John Day, if testified.

Appellant was charged with the same offense as was his father, John Day, and was present participating in the difficulty with Hightower. These acts and occurrences on the part of John Day towards Finlayson occurred some time subsequent to the difficulty between Hightower and the Days.

2. Appellant also reserved an exception to section 15 of the court's charge, which is as follows: "If you believe from the testimony that J. W. Day committed an unlawful assault upon the said Harry Hightower, and that prior to such assault it had been agreed between the said J. W. Day and the defendant Jerome Day to assault, the said Harry Hightower, and that in pursuance of such agreement, if any, the said J. W. Day and the defendant Jerome Day, visited the scene of the difficulty for the purpose of assaulting the said Harry Hightower, and in pursuance thereof the said J. W. Day began an unlawful attack upon the said Harry Hightower; and that in the progress of such attack, if any, this defendant shot the said Harry Hightower, he can not defend against the same under the law of self-defense, even though you further believe that it became necessary for him to shoot to save his own life or the life of his father, J. W. Day."

Under the facts in this record we are of opinion this charge was not justified, and that it was material error. On the day prior to the difficulty under consideration, appellant and one or more other boys had set fire to an old bundle of hay not a great ways from an old dilapidated outhouse under the control of Hightower. Hightower came upon the scene and raised a difficulty with the boys in regard to it. Hightower testified that when he came to where the hay was on fire "I asked him (appellant) what he meant over here, building up a fire over here, and said to him, 'If I were to go over to your father's place and build up a fire he could not get down here quick enough to run me off,' and I told him to go. They set out, and he, appellant, asked me when the old man deeded that place to me, and I told him he didn't allow any hunting and any fires built up." Hightower says appellant began cursing him and went after his knife or sixshooter, and that he, Hightower, reached over his saddle and put his sixshooter down in appellant's face and told him if he pulled his knife he would kill him. In this part of the testimony there is a sharp conflict. To meet this the appellant's evidence shows that he and Walter Sandy and Finlayson had been riding around, and they had a couple of guns. Walter Sandy had a shotgun and Finlayson a

twenty-two target gun. Appellant himself did not have anything, neither a sixshooter nor a knife. Appellant did not own a sixshooter, and never owned one. While riding around Finlayson says, "Let's build a fire," and they rode up to an old rock house and Finlayson went in and pulled out a bale of hay, which had one wire on it, and took it outside and set fire to it, and they were sitting warming by it when Hightower made his appearance. Hightower, as he rode up, said, "What in hell are you doing with that fire here?" Finlayson said, "We are warming," and then, referring to appellant, he said, "Don't you know Little John Day would raise hell if he caught a man with a fire on his place?" Appellant replied, "I don't know; he never did." Hightower then remarked, "By God, you know he would," and when he made that remark appellant said, "Well, when did J. C. Day make you a deed to this place?" Hightower replied, "By God, I am running it." Hightower then jerked his sixshooter and threw it down in appellant's face. Appellant was sitting down when Hightower pointed his pistol at him, and Hightower said, "God-damn you, smile and I will blow your brains out," whereupon appellant, who had been sitting down, got up in an erect position. As he did this Hightower says, "God-damn you, don't you go after any knife." Appellant replied, "I haven't got any knife," and Hightower says, "Put up your knife and I will put up my sixshooter." Appellant repeated to him the second time that he did not have a knife, and Hightower then put up his pistol and began cursing appellant. Finlayson then says, "Let's go, there is no use in having trouble." Appellant said, "Well, let's put out the fire before we go," and Hightower said, "No, get on out of here, God-damn you, I will put out this fire." After appellant got on his horse and rode off, Hightower said, "If you want to fight come out here and I will whip you nine ways of whipping a mule." This is a sufficient statement of the different sides of the first difficulty.

Little John Day, as he is called in the record, who is the father of appellant, had gone to the city of Denton on this particular day for the purpose of paying his taxes. On returning that night Finlayson, who is a cousin of appellant and nephew of appellant's father, informed appellant's father of the transaction. Through the record appellant's father is known as J. W. Day or Little John Day. J. W. Day made a remark to the effect that he would just get his gun and kill Hightower. Then after a moment's reflection he said, no, he was not worth that; a killing would bring about unnecessary trouble, and he would just get him a club and beat him. Walter Sandy, who turned State's evidence in the matter, was living on Little John Day's farm, and had been trying to induce J. W. Day to assist him in purchasing a horse from a Mr. Johnson. Day had agreed to do so, but on account of pressing matters had not attended to the matter, and on the next morning after this difficulty, Sandy insisted on Day going with him to see Johnson in regard to the horse. The three, J. W. Day,

appellant, and Walter Sandy got in a buggy, J. W. Day carrying his pistol, and Walter Sandy carrying a shotgun, he said for the purpose of shooting ducks if they should find any. In going by the place where Hightower lives, which seems to have been on the road to Johnson's, Hightower accosted them and a difficulty ensued between Hightower and J. W. Day. Hightower's evidence tends to put Day in the wrong in this difficulty, while the evidence for the defendant shows that Hightower brought about the difficulty. Hightower challenged Day for trouble, and Day got out of the buggy and crossed into the lot where Hightower was, who had a rock in one hand and a wrench in the other. Nothing except a war of words and threatening gestures occurred at this time. Day had his pistol and Hightower had a wrench and rock. Finally the parties separated, and the Days and Sandy drove on. After driving a couple of hundred yards Hightower, in the meantime having gone to his house and secured what Day thought was a pistol, emerged from the house and leveled what Day thought was a pistol on him, whereupon Day jumped out of the buggy and fired at him with a pistol. Hightower admits bringing the instrument he had holding in both hands in a shooting attitude, but said it was a wrench and not a pistol. The parties pursued their journey and saw Johnson. After discussing the horse trade awhile, nothing come out of it. They went to the little village of Haslett, and from there returned home. On their return Hightower was at the fence near the road nailing plank on the fence, having his shotgun in a few feet of him. Hightower's contention is that he was there nailing on some plank that had been knocked off by stock jumping over the fence, but appellant's theory was that it was a ruse only to be there with his gun in order to shoot him as he came by. We deem it unnecessary to go into a detailed statement of the matters that went to support both of these theories. It is certain that when Hightower went there he borrowed a gun from the witness Henderson and carried it with him to the place where he was nailing, or claimed to be nailing, the plank on the fence. As the Days and Sandy had about passed Hightower, Hightower said to J. W. Day, "What have you got it in for me for?" Day said, "What have you got it in for me for?" Day got out of the buggy and fired one shot at Hightower but missed him. Appellant fired one shot with a shotgun. They were a few feet apart. The shot took effect in and about the head and face, one shot passing through the left hand from the rear of the hand. Appellant's side of the difficulty was the same as to the fact that Hightower accosted him first, and the language used between the parties is testified practically the same by the defense. However, the defensive testimony shows that when Hightower accosted J. W. Day he immediately reached down and got his gun, and was presenting it at the time the shot was fired. The evidence of Henderson shows that there was a shot in the stock of the shotgun right at the front end of where the wood was breached on to the gun. This is supposed

to be the same shot that went through the left hand of Hightower that entered the wood on the gun. In other words, the same shot that made the wound in the left hand of Hightower also entered the wood on the gun. Hightower claimed that his hands were not up in the position to receive the shot, nor his gun. Be that as it may, these are practically the facts, and we think sufficient to show the evidence as bearing upon the charge given by the court.

Sandy made statements very favorable to John W. Day and appellant, in regard to the transaction, to witnesses, until after he made agreement to turn State's evidence with the State, and then his testimony materially changed, but none of his testimony shows there was an agreement between the parties to kill Hightower, and in fact, as we understand this record, there was no agreement made between J. W. Day and his minor son, Jerome, to do anything to Hightower.

Under this statement of the case the charge of the court was erroneous and materially so. We fail to find any evidence of any conspiracy or agreement between the parties to kill or hurt Hightower. J. W. Day had on the previous night said he would get him a club and beat him. There is nothing in the record to indicate if Hightower had not stopped the Days with the remark that he made, that this difficulty would have occurred. The Days were passing along the road and were in the act of passing him without any remark or demonstration at the time Hightower accosted them and began the trouble. Their passing along the road was fully accounted for by the testimony of the witness Sandy, as well as appellant's testimony, to the effect that they were going up to Johnson's for the purpose of buying a horse for Sandy.

This charge is based upon an agreement which the court by the charge assumed that the jury might find from the facts to exist. It conveyed the impression to the jury evidently that the court believed there were facts upon which they might predicate the belief of such agreement. The State having failed to prove such agreement, and the appellant's testimony all excluding it, we are of opinion that this was bringing to the attention of the jury and authorizing a conviction upon facts not found in the record.

For the reasons indicated the judgment is reversed and the cause is remanded.

*Reversed and remanded.*