SAM BURNAMAN V. THE STATE.

No. 2339. Decided May 7, 1913.

**1.—Murder—Evidence—Bias of Witness—Original Testimony—Predicate —Charge of Court.**

Where, upon trial of murder, defendant's brother had given material testimony for the defense, with reference to res gestae statements and conduct of defendant made in the presence of said witness and the State's witness who had been before introduced by the State as to such res gestae, there was no error in permitting the State to reintroduce the said witness to show that said defendant's witness undertook to persuade said State's witness to change or manufacture testimony, and this without laying a predicate therefor, as original evidence to show the bias of said defendant's witness, and without showing that this occurred by defendant's authority; and there was no error in the failure of the court to limit said testimony to the credibility of defendant's witness. Davidson, Presiding Judge, dissenting.

**2.—Same—Evidence—Original Issue—Collateral Matter—Bias of Witness.**

Upon trial of murder, there was no error in permitting the State to show, without laying a predicate therefor, by a State's witness who was present with defendant's brother and heard the res gestae statements and saw the res gestae acts of the defendant, that said brother approached said State's witness and undertook to have him change or compromise this testimony on said res gestae matter, as this was not collateral to the main issue, but was original evidence and was admissible to show the bias of defendant's witness, although defendant was not responsible for the acts of his said brother; besides, the objection thereto was withdrawn. Davidson, Presiding Judge, dissenting.

**3.—Same—Bias of Witness—Rule Stated—Credibility of Witness.**

Motives which operate upon the mind of a witness when he testifies are never regarded as immaterial or collateral matter, and a party may prove declarations of the witness which tend to show his bias, interest, prejudice, or any other mental status which fairly construed, might tend to affect his credibility. Following Pope v. State, 65 Texas Crim. Rep., 51. And this may be shown by cross-examination of the witness, or other witnesses may be called who can swear to the facts showing it, without laying a predicate for such

testimony.   Following Cockrell v. State, 60 Texas Crim. Rep., 124, and other cases.   Davidson, Presiding Judge, dissenting.

**4.—Same—Distinction—Rule Stated—Predicate Not Necessary.**

If it had been attempted to impeach the brother of defendant by showing by the State's witness that he had made statements theretofore in contradiction of his testimony on the trial, a predicate would have been required, but where said brother had given material testimony for the defense, the State could show by its witness the interest and bias of the defendant's said witness in favor of the defendant; and this without showing that the defendant authorized the acts of his brother in undertaking to change the testimony of said State's witness, or laying a predicate.

**5.—Same—Limiting Testimony—Charge of Court.**

It is elementary that it is improper for the court in his charge to limit the effect of evidence which shows the motive or interest of either the defendant or any material witness for him, as such would be a charge on the weight of the evidence; and there was no error, especially, where defendant requested no charge, but raised the question in the motion for new trial, and withdrew his objection to said testimony when it was offered.

**6.—Same—Limiting Testimony—Rule Stated.**

Testimony does not have to be limited where it can only be used by the jury for the purpose for which it was introduced.   Following Sue v. State, 52 Texas Crim. Rep., 122.

**7.—Same—Self-defense—Charge of Court—Harmless Error.**

Where, upon trial of murder and a conviction of manslaughter, it appeared from the evidence that when defendant continued to shoot, it no longer reasonably appeared to him that he was in any danger, there was no error in the court's charge to instruct the jury, that if after the first shot fired by the defendant in self-defense it did not reasonably appear to him that he was in further danger, but he, nevertheless, continued to fire other shots into the body of the deceased hastening the death of the latter, then such later shots would not be in self-defense, but the offense in such case would be of no higher grade than manslaughter; as this, even if restricting defendant's right of self-defense, could not have misled the jury.   Davidson, Presiding Judge, dissenting.

**8.—Same—Sufficiency of the Evidence—Charge of Court.**

Where, upon trial of murder and a conviction of manslaughter, the evidence sustained the conviction under a proper charge of the court, there was no reversible error.

**9.—Same—Evidence—Tampering with Witness—Limiting Testimony.**

Where, upon trial of murder, the State was permitted to introduce testimony for the purpose of showing the bias and interest of an important witness for the defense, and not for the purpose of showing that said latter witness was undertaking to tamper with the said State's witness and thus to corruptly influence him to testify falsely in behalf of defendant, there was no reversible error, although no predicate had been laid for such testimony, and it was not shown that defendant in any way authorized such tampering with said witness, and there was no error in the court's failure to limit said testimony.   Following Earles v. State, 64 Texas Crim. Rep., 537, and other cases.   Davidson, Presiding Judge, dissenting.

Appeal from the District Court of Nacogdoches.   Tried below before the Hon. James I. Perkins.

Appeal from a conviction of manslaughter; penalty, five years imprisonment in the penitentiary

The opinion states the case.

*King & King,* for appellant.—Cited cases in dissenting opinion.

*C. E. Lane,* Assistant Attorney-General, and *W. B. O'Quinn* and *Blount & Strong,* for the State.—Cited cases in opinion.

.PRENDERGAST, JUDGE.—Appellant was indicted for the murder of his brother-in-law, Mike Manning. On a trial he was convicted of manslaughter and his penalty fixed at five years in the penitentiary.

One of the State's most material witnesses was Bill Lee, who gave pertinent testimony against appellant. He and appellant's brother, Philip Burnaman, were together near Philip's house at the time appellant killed deceased. Immediately after the killing appellant went from the scene to said Lee and appellant's brother Philip and made certain res gestae statements to them. The State introduced Bill Lee when first opening and presenting its case. He at that time fully testified to said res gestae statements. After introducing other testimony the State rested. Appellant thereupon, among other witnesses, introduced his brother, Philip Burnaman, who was a most material witness for appellant, and gave pertinent and strong testimony in his favor, disputing, in part at least, the testimony of said Bill Lee as to said res gestae statement, and adding thereto material and strong testimony tending to establish appellant's most material defense, which was self-defense. The State in crossing appellant's brother, Philip, did not ask him if he had attempted to get said Lee to testify as he, Philip, did as to said additional material res gestae statement, or what appellant had said to them and exhibited to them immediately after said killing. In rebuttal after appellant had closed his testimony, the State reintroduced said Lee, who testified denying pointedly the testimony of appellant's brother Philip as to said additional claimed res gestae statement. (The court, in approving appellant's bill raising this question, allowed it in connection with the full statement of the evidence as shown by the statement of facts.) The witness, Philip Burnaman, after having testified for appellant, was excused by the court from further attendance with notice to both parties, and had gone to his home some miles distant, and his further attendance was not had, and he was not again placed on the stand. We here quote in full what then occurred and what said witness Lee testified:

"State: Now the other question we want to ask this witness in regard to the statement of that absent witness, we can't do it unless we have him here to ask the question. Court: Well, if that is all stand him aside. State: We will ask the question. Defendant: We object if there is no predicate laid. State: It is a question I don't think a predicate has to be laid for, the court can pass on that proposition. Q. I will ask you whether or not since the morning of the homicide there, that means the killing, after you met Sam, since that time the brother of Sam, that is, Philip, has approached you and told you that you and him must get together and understand this matter alike so

that you could tell it alike when you came to court?· A, Yes, sir. Defendant: We object to that; that is certainly not impeaching testimony to begin with, and if there is any—all right go ahead, we don't care.

"Philip has talked to me twice about that. In the conversation with Philip he undertook to call my attention to the fact and asked me if I didn't see cut places there; that was a day or so, a couple of days after the killing taken place, I went back up there to work, and he says, 'Didn't Sam show us that cut place on his jumper?' and I says, 'No, he didn't show it to me,' and he says, 'I saw it somewhere,' and says, 'It seems to me like it was when he come up here,' and he says, 'You want to understand this has got to go to court,' and I says, 'Well, I know it, I have been summoned to go to court.'

"Q. And what was it he said to you when he was talking that you answered while ago that you must get together on the matter? Defendant: We object to that. Court: What was it? State: I asked him what was it the brother, Philip, said about getting together. Defendant: Go ahead and relate it again. A. I started to preaching one evening, and Philip saw me coming and come and met me and he stopped me and says, 'You know this little thing is going to be in before the grand jury now right away and we want to get together—' Defendant: We object because this is the statement between two witnesses in the absence of the defendant. Court: ¨It only goes to the credibility of the witness. Defendant: There is no predicate laid for it. Court: I don't think it is a character of matter that requires a predicate. Defendant: We except to the ruling of the court. 'And he says we want to get together and tell this matter so we can tell it alike,' and I told him that I had done told it once just like I saw it—that was the way I was trying to tell it, and I rode off and left him standing there in the road. After Sam came up there where me and Philip were after the shooting·and on that same morning before the body was moved I saw Sam Burnaman again, he was leading his horse as we were moving Mike, we met him coming leading his horse out of the pasture, we were in about seven or eight steps of him; I don't know whether his jumper was buttoned at that time or not; I didn't notice anything wrong with his clothes or torn places anyway, but I didn't notice him much because I was helping carry Mike. I never at either of those times noticed that his clothing were torn and his breast open or anything of that kind."

By his second bill appellant claims that the court committed reversible error in failing and omitting to limit the effect of the said testimony of Bill Lee to impeachment purposes alone of his brother Philip.

His contention is that it is error for the court to have permitted, over his objections, the State to prove that his brother Philip undertook to persuade said Lee to change or manufacture his testimony, unless it be shown that he was connected with or authorized the same. The State contends that this testimony by Lee was ´admissible as original .

evidence for the purpose of showing the bias and interest of Philip in his brother's favor; that it shows or tends to show the motive of Philip in testifying as he did in appellant's favor.

It has many times been decided by this court, and we think it is elementary that the "motives which operate upon the mind of the witness when he testifies are never regarded as immaterial or collateral matters. A party may prove declarations of the witness which tend to show his bias, interest, prejudice, or any other mental state or status, which, fairly construed, might tend to affect his credibility." (Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. Rep., 611, and cases therein cited and principles therein held.) The rule is that the hostility of a witness towards a party against whom he is called may be proved by any competent evidence. It may be shown by cross-examination of the witness or other witnesses may be called who can swear to facts showing it. In People v. Brooks, 131 N. Y., 321, the rule is thus stated: "The hostility of a witness towards a party against whom he is called may be proved by any competent evidence. It may be shown by cross-examination of the witness, or witnesses may be called who can swear to facts showing it. There can be no reason for holding that the witness must first be examined as to his hostility, and that then, and not till then, witnesses may be called to contradict him, because it is not a case where the party against whom the witness is called is seeking to discredit him by contradicting him. He is simply seeking to discredit him by showing his hostility and malice, and as that may be proved by any competent evidence, we see no reason for holding that he must first be examined as to his hostility." This rule was again reasserted in Brink v. Stratton, 176 N. Y., 150.

Mr. Underhill, in his excellent work on Criminal Evidence, section 248, says: "The bias of the witness and his interest in the event of the prosecution are not collateral and may always be proved to enable the jury to estimate his credibility. They may be proved by his own testimony upon cross-examination or by independent evidence. . . . The bias of the witness may be shown either by independent testimony or by questions put to him on his examination." This court has expressly held this in several decisions. Cockrell v. State, 60 Texas Crim. Rep., 124; Porch v. State, 51 Texas Crim. Rep., 7; Bonnard v. State, 25 Texas Crim. App., 173. So has our Court of Civil Appeals at Galveston. Trinity Co. Lumber Co. v. Denham, 29 S. W. Rep., 553. To the same effect see also People v. Mallon, 116 N. Y. Ap. Div., 425, affirmed in 189 N. Y., 520; Morgan v. Wood, 53 N. Y. Sup., 791. In 30 Ency. of Law (2 ed.), 1127, it is said: "In some States evidence showing that a witness is interested in the result of litigation, or otherwise biased in favor of or against one of the parties, is admissible without first examining the witness on the subject," citing the decisions of several States so holding. In the same section, however, it is further stated: "The weight of authority is to the contrary. At least where the bias is sought to be shown by the declarations of the witness him-

self." Again, in 40 Cyc., page 2676, it is laid down: "A party seeking to show interest or bias of an adverse witness is not confined to cross-examination but may introduce independent evidence for the purpose," citing many decisions, some the same as cited in 30 Ency. of Law, above noted. Again, in the following section the further rule is laid down indicating that the foundation for this must first be laid by asking the witness himself. We think it is evident that the two rules are not in conflict. The latter proposition in both of these authorities indicates that the latter rule is where it is attempted by independent testimony to show such bias, interest, etc., by the witness having made *statements* contradicting his testimony on the trial. The distinction in the books is not always kept clear. So in this case, if it had been attempted to impeach the witness Philip Burnaman by showing by the witness Lee that he had made *statements* theretofore in contradiction of his testimony on the trial and such had been attempted to be introduced, then, as a foundation therefor, it would have been necessary to have asked the witness Philip Burnaman himself such questions before such contradictory *statements* could have been proven.

If the appellant had not used as a witness his brother Philip, and his brother had not given such material testimony in behalf of appellant, the testimony of Lee on this point would not have been admissible at all. It is because his brother Philip testified, that said Lee's evidence showing Philip's interest and bias in appellant's favor became admissible.

Appellant cites many cases in his brief to the effect that it is error to permit the State, over his objections, to prove that his friends, relatives or attorneys have undertaken to persuade a witness to leave, change or manufacture testimony in his favor, unless it be shown that the appellant was connected therewith or authorized the same. This also is a correct legal proposition and the cases cited by appellant sustain his proposition, but, as stated above, that is not what was attempted in this case. The testimony of Bill Lee was introduced not for the purpose of showing indirectly or directly that appellant authorized or requested his brother Philip to get Lee to change his testimony or swear that Philip's attempted tampering with the witness Lee was at his instance, or that he was connected therewith, but simply for the purpose of showing the bias and interest of Philip in behalf of appellant. And we think the evidence of Bill Lee on this point could not have been reasonably or otherwise construed to be that Philip's attempted tampering with Lee was at his instance or in his behalf with his knowledge or consent.

It is also elementary that it is improper for the court in his charge to limit the effect of proof which shows the motive or interest of either the appellant or any material witness for him. Such a charge would clearly be upon the weight of the testimony and a comment thereon which is prohibited. The appellant requested no charge in this case. He attempted to raise the question by motion for new trial alone.

Again, as shown above, when this testimony was first offered by the State and the appellant first indicated that he was objecting thereto, it is shown that he said: "All right go ahead we don't care." And when the witness was asked to repeat it, appellant again said: "Go ahead and relate it again," and the witness did so. No motion was then or afterwards made to exclude this testimony. So that under no phase, as we see it, did the court commit any reversible error in admitting this testimony under the circumstances.

Now let us see if the court should have limited the effect of said Lee's testimony on this point, and by not doing so committed reversible error. The rule is as stated by Mr. Branch in his Criminal Law of Texas, sec. 367: "Testimony does not have to be limited where it can only be used by the jury for the purpose for which it was introduced. Leeper v. State, 29 Texas Crim. App., 63, 14 S. W. Rep., 398; Franklin v. State, 38 Texas Crim. Rep., 346, 43 S. W. Rep., 85; Sue v. State, 52 Texas Crim. Rep., 122, 105 S. W. Rep., 804; Rice v. State, 54 Texas Crim. Rep., 149, 112 S. W. Rep., 299; Wright v. State, 56 Texas Crim. Rep., 353, 120 S. W. Rep., 458; Wilson v. State, 60 Texas Crim. Rep., 1, 129 S. W. Rep., 613; Malcek v. State, 33 Texas Crim. Rep., 1, 24 S. W. Rep., 417; Brown v. State, 41 Texas Crim. Rep., 232, 53 S. W. Rep., 866; Harrold v. State, 46 Texas Crim. Rep., 568, 81 S. W. Rep., 728." And as again laid down in section 873, subdivision 3, page 555: "If impeaching testimony can only be used by the jury to impeach a witness it is not necessary to charge on the subject at all. Brown v. State, 24 Texas Crim. App., 170, 5 S. W. Rep., 685; Magee v. State, 43 S. W. Rep., 512; Robinson v. State, 63 S. W. Rep., 869; Newman v. State, 70 S. W. Rep., 951; Watson v. State, 52 Texas Crim. Rep., 85, 105 S. W. Rep., 509; Waters v. State, 54 Texas Crim. Rep., 322, 114 S. W. Rep., 628; Thompson v. State, 55 Texas Crim. Rep., 120, 113 S. W. Rep., 536; Schwartz v. State, 53 Texas Crim. Rep., 449, 111 S. W. Rep., 399; Poyner v. State, 40 Texas Crim. Rep., 640, 51 S. W. Rep., 376; Givens v. State, 35 Texas Crim. Rep., 563, 34 S. W. Rep., 626; Blanco v. State, 57 S. W. Rep., 828."

Take this evidence as succinctly and pertinently stated by appellant's bill, which shows the State was permitted to prove by Lee that Philip Burnaman approached him and said to him as follows: " 'Say, we must get together on this little thing. You know they are going to have us before the court.' I said, Yes, I reckon they will, but all I am trying to do is to tell the truth about it; so Philip Burnaman then said to me again. 'Well, we want to get together on this matter, now you know that he, Sam, came down to us after he killed Mike, and told us that he had to kill him, because Mike was coming on him with his knife; that they had had a fight down in the field and Mike had cut his jumper, and he showed us the place where Mike cut him,' and I told him that I did not notice that nor hear him say that, and he said, 'Now we must get together on this matter.' "

This testimony could not have been used by the jury for any other

purpose whatever than to show Philip's interest in behalf of appellant and his bias in his favor and, thus affect his credit as a witness. It could not have been used by the jury in any way to establish appellant's guilt, or to disprove his defense. Hence the court did not err in failing to charge limiting it to the impeachment of Philip Burnaman.

The court in his charge in giving general definitions and laying down general propositions on self-defense, in a separate paragraph, charged: "If defendant, in the course of the fatal altercation, fired a number of shots you are instructed that, if the first shot was fired under circumstances amounting to self-defense, the defendant had the right in self-defense to continue to shoot as long as it reasonably appeared to him that he was in danger. And if such first shot was fired in self-defense, and defendant fired other shots into the head or body of deceased thereby producing or hastening the death of deceased when it no longer reasonably appeared to him that he was in danger, then such later shots would not be in self-defense (but the offense in such case would be of no higher grade than manslaughter)." Appellant objected to this paragraph of the charge and especially to the last line or two thereof, inclosed in parentheses as above shown, claiming that it was an undue limitation and restriction of his right of self-defense.

The testimony shows that the shooting of the deceased by appellant was with a .22 target rifle. That in order to fire each shot a lever had to be worked to eject the shell as it was fired, and thereby or otherwise shift the next cartridge from the magazine into the barrel of the gun before it could be again fired. That the appellant shot the deceased thus, though rapidly, nine separate and distinct times, each of the nine shots taking effect in the body of deceased. The doctors testified that three of these separate and distinct shots were fired into the top of the head in such course as to show that they were evidently fired after the deceased had fallen and was lying prostrate on the ground; that at least five of the balls which were shot into the body of the deceased were necessarily fatal. It was further shown by the physical facts on the ground that the deceased never approached appellant nearer, as appellant himself testified, than "thirty feet, or something like that." And they were some fifteen or sixteen steps apart. Appellant claimed and testified in effect that he believed deceased was coming on him for the purpose of attacking him with a knife, and that the indications by the deceased's movements with his hand indicated that if not with a knife with some other deadly instrument. The testimony was overwhelming that deceased was wholly unarmed, except a small pocketknife which was found in his pocket closed when searching for arms immediately after the killing; that there were no other arms of any character on or about the person of deceased when he was killed. Appellant himself, in effect, testified that he saw no knife or other weapon in appellant's hand at any time immediately prior to or at the killing. It was also overwhelmingly shown that later when the body of the deceased was removed to his home, and he was undressed in preparation

for burial, that his person and pockets were again searched and no other arms of any kind were found in his pocket or otherwise about his person, other than said small pocket-knife belonging to deceased, which was closed and in his pocket. It was shown that deceased's wife, after his pants were removed in preparation for burial, took them, laid them on a barrel in another room in her residence, and at that time no other knife was in his pocket or otherwise about his pants. It is true that some witnesses on the trial testified that the next day they examined his pants, picking them up off of said barrel, and that then there was found a large knife belonging to one of the witnesses in the pants pockets of the deceased. Even if that knife was so found after that length of time in his pocket it was closed and in his pocket.

Under the circumstances we think that the general proposition laid down in said last above quoted charge was a correct proposition. Certainly it can not be contended with any show of reason that appellant had the right to continue to shoot into the head or body of the deceased when it no longer reasonably appeared to appellant that he was in any danger from the claimed assault or attempted assault by deceased upon him. And clearly after several necessarily fatal shots had been fired into his body and he was lying prostrate on the ground thirty feet from the appellant, he did not have any right, in self-defense, or otherwise, to fire three or more other fatal shots into the top of the head or body of the deceased.

Besides this, in the latter portion of the court's charge, when he submitted appellant's claimed self-defense to the jury, he correctly and fully submitted it in every phase that the evidence raised, in appellant's favor. And even if the general definition and principle laid down in the charge quoted was incorrect, it would not have the effect and could not have had the effect of unduly limiting or restricting appellant's right of self-defense, and could not and did not in any way mislead the jury or have a tendency to do so against appellant.

The court, in submitting appellant's defense of self-defense, we think, clearly submitted it in accordance with the law and the evidence from both phases,—self-defense separate and distinct from threats, and then in a separate paragraph his defense based on threats by the deceased against him. The charges of the court on these subjects are lengthy. It is unnecessary to quote them. Upon a careful consideration of all of appellant's criticisms of the court's charge, we think none of his criticisms show any reversible error and that appellant's rights on both of these theories were clearly, fully and accurately submitted in accordance with the law and the evidence applicable thereto in this case. Appellant requested no special charge on the subject.

There are no other questions presented which are necessary to be reviewed. The judgment will be affirmed.

*Affirmed.*

DAVIDSON, Presiding Judge.—I can not concur and will write dissent later.

[Rehearing denied June 25, 1913.—Reporter.]

DAVIDSON, Presiding Judge (dissenting).—I can not agree with the opinion of the majority affirming this judgment. The propositions announced and rules laid down in the prevailing opinion are so directly contrary and opposed to what has been the settled law in Texas so long that I feel impelled to enter this dissent. I deem it unnecessary to enter into a discussion at length of these matters inasmuch as Messrs. King & King have filed such an able, elaborate and unanswerable brief I shall content myself with adopting that brief and argument as my dissenting opinion. In their argument every proposition presented, and affirmed by my brethren, has been so successfully met from a legal standpoint I could not improve upon it, therefore I adopt it as my dissenting opinion. It is as follows:

"In the preparation of his opinion the writer draws certain inferences from the evidence which we do not believe the record justifies. He adopts that portion of the defendant's evidence suitable for the holding, but ignores the remaining part of his testimony. The questions are not at all new to the criminal jurisprudence in this State, and while we would not invoke the rule of 'stare decisis,' yet this court has so uniformly held with the contentions here made, therefore we can not but insist that the opinion of affirmance is not the law in this State and a rehearing should be granted.

"The court erred in its opinion of affirmance in holding that the testimony of Lee, recited in bill of exception No. 1, that appellant's brother approached him and undertook to have him change or compromise his testimony was not collateral to the main issue and that same was admissible as original testimony, though it does not appear from the record, or the bill, that appellant was responsible therefor.

"The following authorities amply sustain this proposition: Hoy v. State, 39 Texas Crim. Rep., 340; Rice v. State, 51 Texas Crim. Rep., 255; Garcia v. State, 74 S. W. Rep., 916; Clark v. State, 43 S. W. Rep., 522; Pace v. State, 79 S. W. Rep., 531; Sims v. State, 38 Texas Crim. Rep., 637.

"The fact that appellant's brother, who had testified in support of his defense, had been excused by the court, and was at the time absent, does not serve to change the rule announced by the above authorities. It is shown in the statement of facts that appellant's brother was excused by the court in the presence of the prosecuting officers and that they knew he was then leaving town, and when the State proposed to introduce the witness Lee to give the testimony complained of in the bill that they did not believe the testimony was admissible without a predicate made while appellant's brother was upon the stand. On page 67 of the statement of facts, and at the bottom of the page, as the State began to introduce such testimony, we find that the defendant objected,

first, because no predicate had been laid and that the State replied: 'It is a question I don't think a predicate has been laid for, the court can pass on that question,' and again on page 68 of the statement of facts, when the defendant earnestly insisted upon his objection for the reason that the occurrence happened in the absence of the defendant, the court said: 'It only goes to the credibility of the witness.' Defendant: 'There is no predicate laid for it.' Court: 'I don't think it is a character of matter that requires a predicate.' The State not only knew that no predicate had been laid when appellant's brother was testifying, but knew that the witness had been excused and would not longer be in attendance upon the court, and stated in effect at the time the testimony was offered, that it was necessary to lay a predicate. The court took a different view from that entertained both by counsel for appellant or counsel for State, and admitted the testimony as original evidence, the theory upon which the opinion of affirmance holds that it was admissible.

"The opinion holds that it was admissible as *original evidence,* but then *proceeds to assert* that it was *for the purpose of impeaching appellant's brother as a witness and that it could have been considered for no other purpose by the jury.*

"Mr. Wharton in his Criminal Evidence, 9th edition, section 484, explaining what a collateral issue is, quotes from a Pennsylvania case, as follows:

" 'The test of whether a fact inquired of on cross-examination is collateral is this: would the cross-examining party be entitled to prove it as part of his case tending to establish his plea?'

"See also Hart v. State, 15 Texas. Crim. App., 202; Johnson v. State, 22 Texas Crim. App., 206.

"Impeaching testimony whether of the general reputation of a witness, or proof of contradictory statements, or proof of his interest or bias, is always a collateral inquiry. It could not be used by the State for the purpose of supporting its contention. Whether a witness is, or not, thus impeached, does not in the least affect the true facts. It is receivable only in support of the contention that the witness is, or is not, telling the facts as they existed and therefore necessarily collateral to the main inquiry.

"It is conceded in the opinion of affirmance that it is never admissible to allow the State to prove over objection, that friends, relatives or attorneys of the party upon trial had undertaken to persuade a witness to give changed or manufactured testimony in his favor unless it be shown that the appellant was connected therewith, or authorized the same, but the writer of the opinion holds the testimony was not offered for such purpose, but for the purpose of impeaching appellant's brother as a witness. We submit that it is not a question as to the purpose of the State in offering the testimony, but is a question as to the effect the testimony offered would have. It being shown that the witness

who approached Lee was appellant's brother, the jury could not but conclude that appellant was responsible therefor.

"The following cases are ample authority in support of the proposition that such testimony was not admissible: Estep v. State, 9 Texas Crim. App., 366; Barbee v. State, 23 Texas Crim. App., 199; Rushing v. State, 25 Texas Crim. App., 607; Luttrell v. State, 51 S. W. Rep., 930; Garcia v. State, 74 S. W. Rep., 916; Rice v. State, 51 Texas Crim. Rep., 255, 103 S. W. Rep., 1156; Lounder v. State, 46 Texas Crim. Rep., 121; Day v. State, 62 Texas Crim. Rep., 413; Day v. State, 62 Texas Crim. Rep., 448; Grimes v. State, 14 S. W. Rep., 263; Brown v. State, 67 Texas Crim. Rep., 543, 150 S. W. Rep., 436; Branch's Crim. Law, sec. 862.

"While the proposition here announced and supported by the authorities cited is stated in the opinion of affirmance to be sound, yet the court holds that it was admissible to show the bias of appellant's brother, and to, in this way, impeach him as a witness, even in the absence of predicate laid.

"In reply to this holding, we assert that it has ever been the law that where proof of tampering with the witness would not be admissible as original evidence, that it is inadmissible for impeachment, and that error in admitting it is not cured by limiting the same in the charge to impeachment. Rice v. State, 51 Texas Crim. Rep., 255; Garcia v. State, 74 S. W. Rep., 916; Swayne v. State, 48 Texas Crim. Rep., 98; Hoy v. State, 39 Texas Crim. Rep., 340.

"In the case of Garcia v. State, supra, Judge Henderson, speaking for the court, uses this language: 'True, the witness had been introduced by appellant, and had testified to an alibi in his favor, but this did not authorize the introduction of illegitimate testimony against appellant on the pretext of impeaching .the witness. Unless appellant sent his father to see prosecutrix, in order to compromise the case, he would not be bound by anything that his father did in that connection.'

"In Hoy v. State, supra, Judge Davidson, speaking for the court, says: 'The very reason given by the court for the admission of the testimony should have excluded it. If it was not legitimate as original evidence, certainly it could not be used for the purpose of impeaching a witness. Irrelevant or inadmissible evidence does not become admissible or proper because sought to be used for the purpose of impeachment.'

"In the case of Rice v. State, supra, Judge Henderson, upon a motion for rehearing, discussing a similar question, says: 'Of course it will not be contended that this testimony is original testimony inhering in or appertaining to the case; it transpired long after the case. If appellant was shown to be connected therewith, it would constitute original testimony against him as a circumstance suggesting consciousness of guilt in fabricating testimony—and tampering with witnesses comes under that category—but, as stated, the evidence was not offered as original testimony, but as impeaching evidence. Clearly, it was intro-

duced upon a collateral issue, and was confessedly offered to affect the credibility of the witness, Ed Prather.'

"Further discussing the question, the court approvingly quotes from Wharton's Criminal Evidence, as follows: 'Applying this test, was the evidence here offered pertinent to the case, or was it a contradiction upon a collateral issue and not upon any issue involving defendant's guilt or innocence? Evidently it was upon a collateral issue, and both court and counsel so regarded it. The court attempted in its charge to limit this testimony to the impeachment of Ed Prather, but, as has heretofore been held by this court, when illegal testimony for impeachment purposes has been admitted, and this of itself is of a hurtful character, it is impossible for the court to so limit it so as not to prove injurious to appellant.'

"He cited as supporting the proposition so announced Cogdell v. State, 3 Texas Crim. App., 178; Morton v. State, 43 Texas Crim. Rep., 533; Casey v. State, 49 Texas Crim. Rep., 174, 90 S. W. Rep., 1018.

"This confronts us with this situation: the opinion of affirmance is committed to the proposition that the testimony showing that appellant's brother attempted to have a witness compromise or change his testimony, in the absence of appellant and without his knowledge, is clearly not admissible, and the court, from all the authorities above cited, has uniformly held that illegal testimony is never admissible under the guise of impeaching a witness in the case, and further under authorities cited going so far as to hold the error thus committed can not be cured by a charge of the court limiting the illegal testimony to purposes of impeachment.

"Again, the testimony, if otherwise admissible, being collateral, was not admissible in the absence of a predicate laid while appellant's brother was upon the stand and this court erred in its opinion of affirmance in holding the same admissible in the absence of such predicate.

"The writer of the opinion of affirmance holds that the testimony was admissible to show the interest and bias of appellant's brother as a witness. If admissible at all, it was for the purpose of affecting his standing as a witness. He loses sight, however, of the fact that this is but one way of attacking the credibility of a witness. As stated above, the credibility of a witness is always a collateral inquiry. Whether or not a witness is credible has nothing to do with the guilt or innocence of the party upon trial, and all evidence except that tending to establish guilt or innocence. is, according to the rule announced herein above, as quoted by Mr. Wharton's Criminal Law, collateral evidence.

"In the language of the writer of the opinion, 'it is elementary' that all impeaching evidence must be supported by a predicate. The common law rule upon the subject announced as far back as the Queen's case, 2 Bros. & Bing., 312, is to the effect that when a witness has been examined on one side, it is not competent for the opposite party to introduce evidence to show his bias, feeling or partiality towards the parties, unless the witness has been previously questioned himself as to

that point. Even in the discussion of this principle in 40 Cyc., page 2676, and in 30 Ency. of Law, 1127, cited in the opinion, it is there stated that the great weight of authority is in support of the position here taken and against the holding of the opinion.

"We now pass to the rule as it has been uniformly announced by the courts of this State, both in criminal and civil cases, and we here assert, that in so far as we have been able to find, there can be no authorities of the Texas courts found in support of the holding made by the honorable judge in the opinion in this case. All of the authorities hold just to the contrary of the rule as announced in the opinion. Barry v. State, 37 Texas Crim. Rep., 302; Mitchell v. State, 38 Texas Crim. Rep., 170; Nite v. State, 41 Texas Crim. Rep., 340; Martinez v. State, 53 S. W. Rep., 634; G. H. & S. A. Ry. Co. v. LaPrelle, 22 Texas Civ. App., 594. For a full and complete discussion of all the authorities see note, 82 American State Reports, page 54.

"Discussing this question in the case of Barry v. State, supra, Judge Henderson, for the court, says: 'Nor do we believe it was proper for the State to elicit from Mrs. Jackson testimony to the effect that, on the morning after the homicide she was at Mrs. Ford's and that Mrs. Ford endeavored to make her remember that on a certain occasion the deceased, Healy, rubbed his hand on the stomach of Mrs. Barry, the wife of the defendant, and asked her (Mrs. Barry) "when the damn little bastard was going to be born," and on the witness replying that she did not hear deceased use that language, that then Mrs. Barry said to her: "You will have to remember it," or "you must remember it." Now, if Mrs. Ford had been placed on the stand and she had been examined as to this matter for the purpose of showing that she was interested in procuring testimony for defendant or fabricating the same, and she had denied this suggestion to Mrs. Jackson, then Mrs. Jackson might have been examined on this point solely for the purpose of impeachment.'

"It was exactly an effort of this kind to have the witness Lee change his testimony or remember things to which he had not testified, that he says appellant's brother undertook to have him do; that is, appellant's brother tried to make the witness remember having heard appellant make the statements when he approached the two immediately after the killing. We therefore take it that this case is as near in point with the facts in the case under discussion as could be found.

"Again, the same judge in the case of Mitchell v. State, supra, used the following language: 'Now it would have been perfectly competent in order to show that the witness, John Pierce, was prejudiced against appellant; that he endeavored to have his employer discharge him, but the witness, Pierce, should have been first asked about this matter to afford him a chance of denying or explaining the same. His explanation might have been such as to have obviated the necessity of any contradictory evidence. If he had denied the same, then, as showing preju-

dice on his part against appellant, it would have been competent to have contradicted him upon this collateral matter.'

"In the case of Martinez v. State, supra, Judge Brooks, discussing this identical question, uses the following language: 'We think the court erred in permitting the witness, Green, to contradict the witness, Arrera, because there was no predicate laid for contradiction. Appellant's defense was an alibi. His sister and brother-in-law had testified to facts, if true, would have entitled appellant to an acquittal. If the witness, Florentio Arrera, had been asked the question as to whether or not he stated to the witness, Green, at the time indicated in the bill, that appellant was not at the house, said witness might have been able to give some explanation as to the reason for making said false statement that would not have wholly destroyed his testimony.'

"And further in said opinion he says: 'It is a well known rule of evidence that where a party proposes to contradict a witness, the predicate must first be laid by asking the witness if he did not make a certain statement at a certain time and place and to a certain party.'

"He cites in support of the holding: Jordan v. State, 10 Texas, 479; Walker v. State, 6 Texas Crim. App., 576; Mason v. State, 7 Texas Crim. App., 623.

"In the case of G. H. & S. A. Ry. Co. v. LaPrelle, supra, Chief Justice Fisher, for the Court of Civil Appeals, uses the following language: 'The appellee, on the trial of the case, did not lay any predicate for the introduction of this evidence by first inquiring of the witness, Dillon, as to whether such a request for information had been made of him, for the names of the present witnesses, and giving the time and place of such request.'

"He reversed and remanded the case upon this one question, and in the opinion cited in the Queen's case, hereinabove mentioned, and from which opinion the statement hereinabove made is taken.

"Again the court erred in its opinion of affirmance in holding that it was not necessary to limit the testimony of the witness, Lee, as complained of in bill No. 1, for the purpose of impeachment of appellant's brother as a witness, even if the testimony was admissible, as presented in appellant's bill of exceptions No. 2.

"It might be that a jury of lawyers would know how to draw a distinction between the purpose of admission of testimony and the effect of its admission, but how it can be held that the average layman could draw this distinction is beyond comprehension. It is not a question as to the purpose the State or the court had in admitting the testimony. This purpose should have been made known by a charge from the court to the jury limiting the evidence to the purpose for which it was admitted, if it was admissible, the jury had nothing to do with the purpose that may have been hidden in the mind of the prosecuting attorney or buried in the 'breast' of the court in offering certain testimony. They deal with the effect of testimony and not with the purpose for which it was introduced, and it has always been held that if the evi-

dence could be used by the jury as an incriminating fact or to exercise a strong, undue or improper influence upon the jury as to the main issue, injurious or prejudicial to appellant, then it is the duty of the trial court to limit or restrict the effect of such testimony in his charge so that no unwarranted results could ensue. This is practically the language used by the court in the case of Winfrey v. State, 56 S. W. Rep., 919; see, also, Maines v. State, 23 Texas Crim. App., 568; Washington v. State, 23 Texas Crim. App., 336; Davidson v. State, 22 Texas Crim. App., 372; Burks v. State, 24 Texas Crim. App., 326; Wilson v. State, 37 Texas Crim. Rep., 373; Benjamin v. State, 57 Texas Crim. Rep., 291, 122 S. W. Rep., 542; Harvey v. State, 57 Texas Crim. Rep., 5, 121 S. W. Rep., 501.

"This is true and has been held to be true by this court even though the evidence is offered to impeach the credibility of the witness by showing his bias or interest in favor of the party upon trial. Coker v. State, 35 Texas Crim. Rep., 57; Pearson v. State, 56 Texas Crim. Rep., 607.

"As stated above, the jury have to do with the effect of the testimony and not the purpose for which it is introduced. How can they know the purpose of the testimony unless the court informs them in his charge? It is true that a contradictory statement can be used to impeach the testimony of the party who testifies differently from the statement made, but here we have a different proposition. To show that a man's brother approached a witness in his case and undertook to have him change or compromise his testimony would be very persuasive to the jury that the defendant and his family were fabricating a defense, and it would but be the natural course of human nature to so conclude in the absence of a charge specifically telling the jury the purpose and only purpose for which they could consider the testimony.

"The rule is plainly announced by Judge Henderson in Wilson's case, supra, as follows: 'The general rule is that whenever extemporaneous matter is admitted in evidence for a specific purpose incidental to, but which is not admissible directly to prove the main issue, and which might tend, if not explained, to exercise a strong, undue or improper influence upon the jury upon the main issue, injurious and prejudicial to the right of the party, then it becomes imperative by the court in its charge to so limit and restrict it as that such unwanton results can not ensue; and the failure to do so will be radical and reversible error, even though the charge be not excepted to.'

"Again, in Taylor's case, supra: 'It is permissible where motive is the important question to prove other transactions of a similar character . . . but when this is permissible, it is always important that the charge of the court should properly limit and restrict the jury in their consideration of such testimony exclusively to the purposes of its admission, unless they should give it unwanton weight and as evidence proving the main fact.'

"In the case of Bennett v. State, 43 Texas Crim. Rep., 241, discussing the necessity of limiting testimony, the following language is used:

'But, without an instruction on the subject, would the jury confine their consideration of said testimony to that purpose alone? Would they know the object of its introduction? It must be remembered that jurors are, for the most part, unacquainted with the rules of law, and, therefore, the necessity on the part of the court to instruct them with reference to their duties.'

"Now, whatever appellant's brother said to the witness, Lee, it was subsequent to and no part of the transaction in which appellant shot and killed deceased, and as said in the quotation last above, 'would the jury confine their consideration of said testimony to that purpose alone? Would they know the object of its introduction?' In the present case, would not the jury conclude that the testimony was admitted for all purposes, and if so, would it not be natural for them to conclude that appellant was responsible for his brother's acts?

"The court, in its opinion of affirmance, overlooked entirely the case of Coker v. State, supra, decided by the sage of the criminal law of this State, Judge Hurt. In that case the State was undertaking to locate the shoes worn by Coker at the time of the homicide, it being shown that the shoes would likely reveal the truth as to whether or not the defendant committed the offense. His mother was one of his strongest witnesses, and the State was undertaking to show, and did show circumstantially, that she had hidden his shoes. An objection was reserved to the testimony and it was also objected that the court did not limit the testimony and Judge Hurt, in disposing of the question, in reversing the case, used the following language: 'Again, if Mrs. Sallie Coker concealed the shoes, appellant was not responsible for her acts. She, however, being a witness for him, the State, for the purpose of proving that she was very much biased in his favor, if not wholly corrupt, and therefore wholly unworthy of belief, could show it. This evidence, however, was not limited to the only purpose for which it could have been introduced. The jury were not instructed to consider it only for the purpose of impeaching Mrs. Coker. In the absence of instruction clearly and emphatically limiting it to its proper use, the jury would in all probability reason thus: the mother knew her son to be guilty; she knew or believed that his shoes, if found, would convict him; hence her conduct. She concealed them from the officers.'

"That case is directly in point with that feature of the question now under discussion. There it was attempted to show that the mother of Coker, and who, by the way, was a witness in his behalf, had suppressed testimony, and Judge Hurt clearly holds that it was the duty of the trial court to specifically and emphatically limit the effect of the testimony to the purpose of impeaching Mrs. Coker as a witness. This completely answers the opinion of this court wherein it is stated that the testimony was admissible because appellant's brother was a witness in the case.

"Again, in Pearson's case, supra, this court, then composed of its present presiding judge and Associate Judges Brooks and Ramsey,

through a majority of the court, held in discussing the following question propounded to Pearson's witness, White, while upon the stand, towit: 'You are the man that went around to Mr. Pearson's daughter just after the killing and told her not to tell anything on him, didn't you?' that while the same was admissible to show the interest and bias of the witness, it was, nevertheless, the duty of the court to limit such testimony to the purpose for which it was admitted. The presiding judge of this court wrote the opinion in the Pearson case, and dissented, holding that the testimony was not admissible for any purpose, and cites the cases which appellant cites in his brief, as sustaining his dissent. The other two judges disagreed with the presiding judge as to the admissibility of the testimony, but held that it was the duty of the court to limit the effect of the same and, therefore, permitted the reversal of the case.

"Again, the court erred in holding the charge of the court instructing the jury that if defendant fired a number of shots, and the first shot was fired in self-defense, still if he continued to shoot, so as to hasten the death, when it no longer reasonably appeared to him that he was in danger, that such latter shots would not be in self-defense, but the offense in such event would be of no higher grade than manslaughter.

"'If the defendant in the course of a fatal altercation fired a number of shots, you are instructed that if the first shot was fired under the circumstances amounting to self-defense, the defendant had the right in self-defense to continue to shoot as long as it reasonably appeared to him that he was in danger, and if such first shot was fired in self-defense and defendant fired other shots into the head or body of deceased, thereby producing or hastening the death of the deceased when it no longer reasonably appeared to him that he was in danger, then such later shot would not be in self-defense, but the offense in such event would be of no higher grade than manslaughter.'

"The charge is an undue limitation and restriction of defendant's right of self-defense for the reason the testimony nowhere suggests the issue presented. All the testimony shows the shots were fired rapidly and that it was a continuous transaction, hence the charge presented an issue justifying defendant's conviction for manslaughter not raised by the testimony. Under the charge the jury were justified in finding as they did for manslaughter, notwithstanding they might have believed that the first shot produced the death, and that it was fired in self-defense. It is no offense to fire an additional shot, if death resulted from the first shot. Besides the court does not present in his charge to the jury the converse of the proposition. It was a charge upon weight of evidence and calculated to lead the jury to the conclusion that the court was of the opinion that appellant was at least guilty of manslaughter because he had fired some eight or nine shots. Clark v. State, 56 Texas Crim. Rep., 293; Smith v. State, 23 S. W. Rep., 701; Duke v. State, 33 S. W. Rep., 433; Jones v. State, 44 Texas Crim. Rep., 405; Swain v. State, 48 Texas Crim. Rep., 98, 86 S. W. Rep., 335; Best v.

State, 61 Texas Crim. Rep., 551; Foster v. State, 67 Texas Crim. Rep., 5, 148 S. W. Rep., 583.

"This charge authorized appellant's conviction for manslaughter if he fired a shot after Manning's death, even though the first shot was fired in self-defense. It is no offense to fire a shot into the body of one who has expired. If this was true, he would be guilty of manslaughter if he went now and fired into the body of deceased. That he fired after the death of deceased is receivable as evidence only for the purpose of arriving at the motive with which he fired the first shot. There being no question of an abandonment of the difficulty on the part of the deceased, and all the evidence showing that it was a continuous transaction, we submit that if the first shot was in self-defense that all were in self-defense, and that it was error to permit his conviction for manslaughter under the terms of this charge.

"The judge writing the opinion infers that appellant fired shots after deceased was upon the ground, whereas all of the testimony is to the contrary. The doctor used by the State testified that all of the shots were straight in with the exception of two and that they ranged slightly downward. He could not even approximate the degree of the range; and defendant, the only eyewitness, testified that all shots were fired before deceased fell. A minute description is given in the opinion as to how long it took to operate the gun, for the purpose, we presume, of destroying the idea that it was a continuous transaction. The evidence upon this point is that it was a four-arm rifle, one of those rifles that works with a slide, that you did not have to throw it back and forth like an ordinary Winchester, but that you could shoot it as fast as you could work the trigger. Appellant testified that it was a repeating Remington, four-arm rifle and that he could shoot it as rapidly as he could work his hand and that he did not shoot after Manning fell. Miss Maud Layton testified that she heard the shots and it went just like firecrackers. This was all the testimony as to how the shots were fired, and we submit that it showed a continuous transaction, without ceasing or interruption, and if so, and the first shot was fired in self-defense, all were fired in self-defense. The testimony does not suggest the idea of an abandonment of the difficulty or of a cessation of the shooting and the same is in line with the opinion by Judge Harper in the case recently decided wherein he held that the shots were a continuous transaction.

"Taking the case upon the whole, each of the questions discussed, appellant is entitled to a reversal."

PRENDERGAST, JUDGE, HARPER, JUDGE (replication to dissenting opinion).—In complete reply to the brief and argument of appellant's attorneys, made the dissenting opinion herein, the stenographer is hereby directed to give immediately following this, the brief and argument of Hon. C. E. Lane, Assistant Attorney-General, and

Messrs. Blount & Strong, in behalf of the State, citing and quoting the authorities as given by them.

The said brief and argument of Hon. C. E. Lane, Assistant Attorney-General, and Messrs. Blount & Strong for the State, is: ·

1. "In view of the fact that the opinion affirming this case so thoroughly and completely disposes of every question raised by appellant, we really deem it unnecessary to file a reply to the motion for rehearing filed herein; but in view of the fact that the opinion of affirmance is not concurred in by all members of the court, we desire to cite a few additional authorities.

"Attorneys for appellant in presenting the motion for rehearing seem to have a misconception of the purpose for which the testimony of the witness, Bill Lee, was introduced by the State. They seem to be laboring under the impression that this testimony was introduced by the State 'for the purpose of showing that the brother of defendant was undertaking to tamper with the witness, Bill Lee, and to corruptly influence him to testify falsely in behalf of defendant,' and all the authorities cited in the motion for rehearing are cases of this character, and in our judgment, do not touch the real question presented. As stated by the court, in its opinion affirming this case, such was not the purpose of the testimony and there is nothing in the testimony that could possibly lead the jury to believe that such was the purpose,— the only purpose for which the testimony was offered and for which it could be possibly used by the jury was to show the *interest* and *bias* of the witness, Philip Burnaman, in behalf of his brother, the defendant, and the trial court so stated to the jury when the testimony was admitted, using this language: 'It only goes to the credibility of the witness.'

"We are aware of the rule that the trial court can only charge the jury in writing, yet in passing upon the proposition of whether or not the jury probably used this testimony for any other purpose to the detriment of the defendant, and especially in the absence of a requested special charge to limit this testimony, we believe the court is authorized to consider this, because under the authorites in the absence of a special charge it must, at least, reasonably appear that the jury, in all probability, *did use the testimony improperly against the defendant.*

"That this testimony was clearly admissible to show the interest and bias of the witness, Philip Burnaman, and that to without laying a predicate, we call the court's attention to the following additional authorities: Earles v. State, 64 Texas Crim. Rep., 537, 142 S. W. Rep., 1181; Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. Rep., 611; Sexton v. State, 48 Texas Crim. Rep., 497; Warren v. State, 54 Texas Crim. Rep., 448, 114 S. W. Rep., 380; Lowery v. State, 53 Texas Crim. Rep., 562, 110 S. W. Rep., 911; Burnett v. State, 53 Texas Crim. Rep., 515, 112 S. W. Rep., 74; Clark v. State, 43 S. W. Rep., 522; Sue v. State, 52 Texas Crim. Rep., 122, 105 S. W. Rep., 804; Renn v. State, 64 Texas Crim. Rep., 639, 143 S. W. Rep., 167; Burman v. State, 67

Texas Crim. Rep., 8, 148 S. W. Rep., 757; Sims v. State, 45 S. W. Rep., 705; Tow v. State, 22 Texas Crim. App., 175; Porch v. State, 50 Texas Crim. Rep., 335, 99 S. W. Rep., 102.

"In the case of Tow v. State, above cited, Judge Willson, speaking for the court, says: 'After she (Mrs. Cowan) had testified on the trial, the defendant offered to prove that about two hours before the homicide she said that she made her son, James Cox (the deceased) clean up the shotgun and load it with twelve buck shot in each barrel and told him if defendant came on her premises to kill him. This proposed evidence upon objection made thereto by the State, was rejected. This ruling of the court was erroneous. If for no other purpose, the offered evidence was competent to disclose the unfriendly state of the witness's feeling towards the defendant and the malignant character of such feeling.'

"*It is always competent to show the animus, the state of feeling of the witness towards the party against whom such witness testified, and in such examinations great latitude is allowed.* (See Tow v. State, 22 Texas Crim. App., 175.)

"We call the court's attention to the fact that no predicate was laid before offering to prove these declarations of the witness, Mrs. Cowan. The court holds such declarations admissible as independent and original testimony to show *bias, interest,* etc.

"In the case of Clark v. State, above cited, Judge Hurt, speaking for the court, says: 'It appears by bill of exceptions No. 6 that appellant introduced one Peter King, a negro, who testified to material facts for the defendant. Counsel for the State, on cross-examination, asked the witness, "If he did not, during the trial of this case, go to Jonas Williams (a negro witness for the State), and offer to give him $10 for the purpose of paying a fine assessed against Williams' daughter, at Scurry, Texas, if he (Williams) would not testify against him (King) at this trial?" King replied that he did not do so. Afterwards Jonas Williams was placed on the stand, and testified that Peter King had offered him $10, etc. Appellant objected to this testimony, and the court overruled the objections, and defendant excepted. This evidence was clearly admissible. Its object was to show the interest and anxiety of Peter King in behalf of appellant. The jury had a right to know what his feeling and interests were, so as to pass upon the credit to be given to his evidence. It was that character of testimony that would not be used by the jury for any other purpose than as going to the credit of Peter King.' (See Clark v. State, 43 S. W. Rep., 522.)

"In the case of Sexton v. State, above cited, this court, in an opinion delivered by Judge Davidson, held that it was permissible to elicit from a witness for defendant 'that she (the witness) had lived in adultery with the defendant for five or six years,' and 'that she knew the defendant had a living wife and child while she was living in adultery with him,' for the purpose of showing her motive and bias in the case then on trial for swindling of defendant, and the friendship and close rela-

tion to the defendant, and the opinion does not show that this testimony was limited to the purpose for which it was introduced.

"In the case of Burnett v. State, above cited, Judge Ramsey, speaking for the court, says: 'There can be, we think, no doubt that it is always permissible in every case where it can be shown by competent evidence to make proof of the hostile attitude of any witness in respect to any party for any cause before the court. Such evidence is clearly admissible for the purpose of affecting the credibility of a witness and the weight of their testimony,' citing Enc. of Evidence, vol. 2, page 406; Surrell v. State, 29 Texas Crim. App., 321; Watts v. State, 18 Texas Crim. App., 381. (See 112 S. W. Rep., 79.)

"In the case of Porch v. State, above cited, Judge Brooks, speaking for the court, says: 'Of course, it is a well known rule of law that declarations and acts of witnesses out of the presence of appellant can not bind appellant; but this rule has its qualifications. Declarations of witnesses who testify for the State or defense, which show their bias, prejudice or favoritism, may be introduced for the purpose of showing said bias, prejudice or favoritism.' (See Porch v. State, 50 Texas Crim. Rep., 335, 99 S. W. Rep., 102.)

"In the case of Renn v. State, above cited, this court, speaking through Judge Harper, in a very able and well considered opinion, upon the identical question here involved, after citing numerous authorities in support of his position, and that of the majority of the court, quotes with approval the following from the American & English Ency. of Law, vol. 30, page 1102:

" 'Disparaging evidence of matters otherwise collateral, may be received when it tends to show the temper, disposition or conduct of the witness in relation to the cause or parties; and not only is this evidence admissible on cross-examination of the witness, but other witnesses may be questioned by the opposite party in relation thereto,' citing authorities.

"This case is not only directly in point on the admissibility of this testimony, but also directly in point on the proposition that it was not necessary to lay a predicate before same was admissible.

"In the case of Sue v. State, 52 Texas Crim. Rep., 122, 105 S. W. Rep., 804, the court, speaking through Judge Brooks, on the admissibility of this character of testimony, says: 'Bill of exceptions No. 43 shows that while the witness, Dr. Shields, for the State was on the stand, the following questions were propounded to him by the State: "State whether or not the witness, John Daniels, a witness for the defendant, had told him (Shields) in the town of Winnsboro, about six months ago that if he (Shields) would assist him (Daniels) in testifying that the malt corn hauled to Shields' mill by the witness, Daniels, belonged to the witness, J. S. Warren; that they would send the old scoundrel (meaning Warren) to the penitentiary." Appellant objects to same because the same is irrelevant and immaterial and was an attempt by the State to impeach the witness, Daniels, upon an imma-

terial issue and has no connection whatever with the case and throws no light whatever upon same. *This testimony* was pertinent in that it showed *animus* on the part of the defense witness, Daniels, against the State and favoritism on his part to the appellant.'

"The court, in the same case, upon the question of limiting testimony of this character, says: 'Bill of exceptions No. 45 complains that the court erred in its failure and refusal to limit the testimony of the witness, Alex Brice, wherein he testified that the defendant's witness, Will Lemmons, had said to him on the 8th or 9th of January, 1907, at Perryville, Texas, "that the State in this case is up against a hard proposition, as the defendant's attorney and his Uncle John Nixon and he (Lemmons) was all working for the defendant in this case and that this was a hard proposition for the State to go up against." This testimony could not possibly have been used for any purpose. Therefore, it was not necessary to limit the same. (Citing numerous authorities.) When testimony could not be illegitimately or rationally used for any other purpose, it is not error to refuse to limit same for that purpose.'

"In the recent case of Burman v. State, 67 Texas Crim. Rep., 8, 148 S. W. Rep., 757, this court, speaking through Judge Harper, in passing upon the admissibility of this character of testimony says: 'In bill No. 6 it is complained that the State was permitted to ask Myrtle Lindsenby, a witness for defendant, if Jim Burman, an uncle of defendant, had given her a pair of shoes. If it was a question of whether or not Jim Burman had attempted to bribe the witness, the defendant not being connected with it, it would, perhaps, have been inadmissible, but the objections were that it was calculated to prejudice defendant with the jury and to impeach the testimony of the witness. The relations existing between the parties, the state of their feelings, their bias and prejudice, *have always been held* to be admissible and if the testimony was adduced to show the relation existing between the Burman family and the witness it would he admissible for that purpose.' (Citing Earle v. State, 64 Texas Crim. Rep., 537, 142 S. W. Rep., 1181, and Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. Rep., 611.)

"It does not appear that any predicate was laid before this testimony was offered, but same was offered as original and independent testimony to show the bias and interest of the material witness for the defendant. It does not appear either that this testimony was limited for the purpose for which it was introduced.

"Mr. Branch in his Criminal Law, in discussing the admissibility of this class of testimony, section 461, page 545, says: 'The motives which operate upon the mind of the witness when he testifies are never regarded as immaterial or collateral matters. A party may prove *declarations* of witnesses which tend to show bias, interest, prejudice or any other material state or status, which fairly construed might tend to affect his credibility,' citing the following authorities in support of this proposition: Mason v. State, 7 Texas Crim. App., 623; Sager v. State, 11 Texas Crim. App., 110; Bonnard v. State, 25 Texas Crim.

App., 173; Bennett v. State, 28 Texas Crim. App., 539; Green v. State, 54 Texas Crim. Rep., 3; Gelber v. State, 56 Texas Crim. Rep., 460; Reddick v. State, 47 S. W. Rep., 993.

"These authorities conclusively settle the proposition that this testimony was clearly admissible for the purpose of showing the bias and interest of the witness, Philip Burnaman, who was a very material witness for appellant.

2. "We feel that we should apologize to the court for further burdening the record in this case, and we would not do so but for the fact that counsel for appellant, after this case was submitted on motion for rehearing, requested time of the court in which to file an additional brief, and as we understand were granted by the court until the 11th of the present month (June) to do so. No additional argument was filed by that date, hence if one is filed we will not have an opportunity, probably, to see it before this case is finally disposed of.

"We have carefully re-read the motion for rehearing filed in this case and most of the authorities cited therein, and after doing so we are still convinced, as we were when this case was originally submitted, that there is not a serious question raised by the record in this case, and it strikes us that counsel for appellant are rather seeking to *drive* this court to a retraction of the original opinion of affirmance, by *constant insistence* rather than by citation of authority in support of their contention.

"In our reply to the motion for rehearing we devoted most of same to argument and citation of authorities that the testimony of the witness, Lee, as to what the witness, Philip Burnaman, said to him was admissible for the purpose of showing the bias and interest of said witness. We did this for the reason that counsel for appellant seemed to rely principally upon the inadmissibility of this testimony for a reversal of this case. We believe the authorities cited by the court and in this reply on this proposition has even convinced counsel for appellant that this testimony was admissible for that purpose.

"In view of the fact that we are not apprised of just what the 'additional argument' of counsel will be, we desire to refer, in a brief way, to the assignment of error that this testimony should have been limited by the trial court.

"Mr. Branch, in his Criminal Law, section 366, states the rule with reference to limiting testimony as follows: 'If impeaching testimony could be used by the jury for purposes other than impeachment *so as to exercise a strong, undue or improper influence* with the jury *as to the main issue, injurious and prejudicial to defendant,* the charge must limit it so that no unwarranted results would ensue (citing numbers of authorties).'

"Judge Brooks, in the case of Sue v. State, 52 Texas Crim. Rep., 102, lays down the rule as follows: 'When testimony in a trial for murder could not have been *legitimately* or *rationally* used for any other

purpose than that for which it was offered there was no error in failing to limit same to that purpose.'

"This rule is cited with approval in the case of Wright v. State, 56 Texas Crim. Rep., 353.

"Now the court will notice in the rule laid down by Mr. Branch and approved by this court, that the testimony must be such if not limited that it could exercise a *strong, undue* or *improper* influence with the jury as to the *main issue* injurious and prejudicial to defendant.

"Under this rule the court must conclude from this record that the testimony of the witness, Lee, could *legitimately and rationally* be used by the jury to exercise a *strong, undue* or *improper* influence with the jury in finding appellant guilty of the offense *with which he was charged.* That is that it was such testimony that the jury would, probably, use, if not limited, to establish the fact that appellant unlawfully killed deceased, and in passing upon this proposition this court must presume that the jury who tried this man was, at least, of average intelligence and had some regard for the oath administered to them and the charge of the court delivered to them.

"The testimony of the witness, Lee, in effect, was 'that Philip Burnaman came to him on two different occasions and told him that they ought to get together on what appellant said to them just after the killing, as they would soon have to go to court,' and then repeated what he (Philip) understood appellant to say on that occasion, and the only reply made by the witness, Lee, was that he expected to tell the truth about the matter.

"This certainly does not show an attempt on the part of Philip Burnaman to bribe the witness, Lee, but it shows not only a great interest on the part of Philip in his brother but a strong bias in his favor. This does not fall in the class of cases cited by appellant at all. All those cases are where the friends and relatives had undertaken to improperly or corruptly influence the witness.

"Can it be said that there was anything in the conversation between the witness, Lee, and Philip Burnaman that tended, in any way, or could have been used in any way by the jury to establish the guilt of appellant for unlawfully killing deceased, *which was the main issue to be established?* Can it be said that the mere fact that Philip Burnaman was a brother of appellant and had this conversation with the witness, Lee, that an intelligent jury would presume that appellant was responsible for the conversation and would, therefore, override the charge of the court and send this man to the penitentiary on presumption instead of evidence? Juries in Texas are ordinarily men of average intelligence, of at least sufficient intelligence to understand and regard their oaths, and as said by Judge Brooks, in the Wright case, supra, 'It is utterly irrational to presume that a sworn jury would disregard their oaths and convict a man of murder on the theory that they thought he had committed burglary.'

"Outside of showing the interest of the witness, Philip Burnaman, what occurred between him and the witness, Lee, was favorable to appellant, for Philip stated on that occasion just what he testified to in the case, which was favorable to defendant, and it therefore tended to corroborate Philip's testimony, because it showed that he was making the same statement the day after the killing that he made on the trial. The witness Lee made no statement as to how he understood the matter, therefore the naked fact that Philip had this character of conversation with Lee is the one thing that appellant claimed that the jury could use to his disadvantage, and in order for this case to be reversed this court must determine that an intelligent jury, duly sworn, did permit this fact to exercise a *strong, undue* or *improper* influence in determining the guilt of appellant of manslaughter. To our minds, if the court will pardon the expression, it is absolutely absurd to impute to a jury any such want of common sense, and would, indeed, be going far into the field of imagination and speculation, and would write into the jurisprudence of this State a precedent, if followed, that would result in the improper reversal of many cases.

"The case of Clark v. State, 43 S. W. Rep., 522, is a case, in our judgment, disclosing facts which were much more calculated to injure the rights of appellant than the facts of the case at bar, and we desire to call the court's special attention to the opinion of Judge Hurt in this case, as follows:

" 'It appears by bill of exception No. 6 that appellant introduced one Peter King, a negro, who testified to material facts for the defendant. Counsel for the State, on cross-examination, asked the witness, "If he did not during the trial of this case go to Jonas Williams (a negro witness for the State) and offer to give him $10 for the purpose of paying a fine against Williams' daughter if he (Williams) would not testify against (we construe this to mean contrary) him (King) at *this trial?*" King replied that he did not do so. Afterwards Jonas Williams was placed on the stand and testified that King had offered him $10, etc. Appellant objected to this testimony and the court overruled the objection and defendant excepted. This evidence was clearly admissible. Its object was to show the interest and anxiety of Peter King in behalf of appellant. The jury had a right to know what his feelings and interests were so as to pass upon the credit to be given his evidence. *It was that character of testimony that would not be used by the jury for any other purpose than as going to the credit* of Peter King.'

"Certainly if the testimony set out above in the Clark case which was offered to show the interest of a defendant's witness should not have been limited by the court to the purpose for which it was offered, it will require no further argument that the testimony in the case at bar was not that character of testimony, requiring at the hands of the court a charge limiting same.

"In our reply to the motion for rehearing heretofore filed, we referred to and quoted from the case of Sue v. State, 52 Texas Crim. Rep., 122,

105 S. W. Rep., 804, and we desire here again to call the court's particular attention to this case, and the authorities cited therein by Judge Brooks, on the question of it not being necessary to limit testimony of this character.

"As heretofore stated, this court to grant this motion for rehearing must be convinced that the jury permitted this testimony to exercise a *strong, undue* or *improper* influence as to the *main issue* and that they could, *legitimately* and *rationally,* use it for that purpose, and in this connection we call the court's special attention to the fact that the record shows in this case that at the time the trial court admitted this testimony he stated in the presence and hearing of the jury the specific purpose for which it was admitted, and while we understand that charges in felony cases to a jury must be in writing, yet we submit that in passing upon the proposition as to whether or not the failure to limit this testimony did cause the jury to permit same to exercise an *improper* influence on them in the consideration of the case, that this court can and should take into consideration this statement of the trial court at the time he admitted the testimony, for the reason that it absolutely destroys the proposition asserted by appellant, that the jury did use this testimony for some other purpose than that for which it was admitted.

"Judge Brooks, while on the bench, rendered an opinion in which he held that a verbal declaration of this kind could and should be taken into consideration in passing upon the proposition as to whether appellant was probably injured by the failure to limit testimony. The writer of this read this opinion within the last two weeks, but we have so far been unable to put our hands on it again, and, therefore, will be unable to cite it, but without reference to this opinion by Judge Brooks, it seems to us to be a sound proposition of law, that this court is fully authorized to take into consideration the entire record in the case in passing upon this matter.

"No special charge was requested by appellant limiting this testimony and this court has repeatedly held, in the absence of a special charge, that it must be apparent that injury was done the defendant by failure of the court in its main charge to charge on any particular phase in the case.

"In addition to the authorities cited above and those cited in our reply to the motion for rehearing heretofore filed, we call the court's attention to the following additional authorities: Blanco v. State, 57 S. W. Rep., 828; Waters v. State, 54 Texas Crim. Rep., 322; Wright v. State, 56 Texas Crim. Rep., 353; Treadaway v. State, 65 Texas Crim. Rep., 208, 144 S. W. Rep., 655; Harrelson v. State, 60 Texas Crim. Rep., 534; Branch's Crim. Law, sec. 873, p. 555, last subdivision.

"We submit that this court can not, reasonably, arrive at the conclusion that the jury in this case could, *legitimately* and *rationally,* use this testimony in establishing the *main issue,* and that said testimony did exercise a *strong, undue* or *improper* influence with the jury for said

purpose, and therefore there was no error in failing to limit said testimony.    Certainly none in the absence of a requested special charge.

"We submit that the appellant in this case, from the record before this court, has had a fair and impartial trial at the hands of an intelligent jury; that his punishment is, indeed, lenient for the crime committed, and that the motion for rehearing should, we earnestly insist, under the authorities, be overruled.

3.    "That the trial court properly charged on defendant's right to continue to shoot so long as it reasonably appeared to him that he was in danger, etc., we cite the following additional authorities:    Clark v. State, 56 Texas Crim. Rep., 293; Smith v. State, 57 Texas Crim. Rep., 455; Swain v. State, 48 Texas Crim. Rep., 98; Branch's Crim. Law, sec. 452, p. 278.

"Under these authorities—in fact, under the unbroken line of decisions in this State—it would have been reversible error under the facts in this record for the trial court to have failed to have given the charge which was given on the right of defendant to continue to shoot so long as it reasonably appeared to him that he was in danger.

"On the proposition that the trial court properly charged the jury in this same paragraph of his charge that defendant did not have the right to continue to shoot after the danger ceased, as viewed from his standpoint, we call the court's attention to the opinion of this court, speaking through Judge Harper, in the case of Renn v. State, 64 Texas Crim. Rep., 639, 143 S. W. Rep., 167.

"It is certainly an elementary proposition of law .that defendant has not the right to continue to shoot and inflict wounds that hasten or contribute to the death of the deceased after the danger has ceased as viewed from his standpoint, and this is what the trial court told the jury in the case at bar, and the trial court only instructed the jury on this phase of the law in connection with his charge presenting one phase of manslaughter.

"If the trial court had not given the latter part of the paragraph of the charge on this subject, as follows, 'And if such first shot was fired in self-defense and defendant fired other shots into the head or body of deceased, thereby producing or hastening the death of deceased, when it no longer reasonably appeared to him that he was in danger, then such latter shots could not be in self-defense, but the offense in such event would be no higher than manslaughter,' the jury might have found from the evidence that the first shot was fired in self-defense, but that other shots which hastened or contributed to the death of deceased were fired not in self-defense, and have found the defendant guilty of murder in the second degree,—hence it was incumbent upon the trial court to give the portion of the charge above quoted.    But in justice to the State, the court should have required the jury to find that the ingredients of manslaughter existed at the time of the firing of the last shots before they would be justified in reducing the offense to manslaughter, but instead of so doing he simply charged the jury that under

such circumstances defendant could be guilty of no higher offense than manslaughter, and certainly the defendant can not complain at this charge as it was presenting one phase of the case raised by the facts *in a most favorable light* to him.   We therefore submit that there is nothing in the contention of appellant on this charge."